# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| United States of America | : | Case No. 3:08-cr-053 |
| | : | |
| | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER DENYING |
| | : | DEFENDANT ELBERT LEE |
| Elbert Lee Hale and | : | HALE'S AND JOYCE A. |
| Joyce A. Hale, | : | HALE'S MOTIONS TO |
| | : | SUPPRESS EVIDENCE |
| Defendants. | : | |

This matter comes before the Court on Defendant Elbert Lee Hale's and Joyce A. Hale's

separate motions to suppress evidence. (Docs. 21 and 22.) Defendants are charged in a twenty-

eight count indictment. Elbert Hale is charged with three counts of making false statements on

an income tax return in violation of 26 U.S.C. § 7206(1) and twenty-three counts of structuring

financial transactions to evade reporting requirements in violation of 31 U.S.C. § 5324(a)(3) &

(d). Joyce Hale is charged with two counts of making false statements in violation of 18 U.S.C.

§ 1001.

Elbert and Joyce Hale each filed a Motion to Suppress and Memorandum in Support

(docs. 21 and 22) and the Government filed a consolidated response to both motions (doc. 23).

With his motion, Elbert Hale seeks to suppress all evidence obtained during the search of his

home (1701 Ladera Trail, Dayton, Ohio), his business (906 Watertower Lane, West Carrollton,

Ohio), and his vehicles. Joyce Hale seeks to suppress all evidence obtained during a search of

her home (1232 Kemper Avenue, Dayton, Ohio) and of her vehicle. Both Defendants

additionally move to suppress any and all statements they may have made during and as a result of those searches. The Court held a hearing on Defendants' motions on October 22, 2008. Three witnesses, Internal Revenue Service Special Agent Della Blunk (formerly Della Hiegel), Internal Revenue Service Special Agent Laurel Vant, and Dayton Police Detective William Myers, testified at the suppression hearing.

For the reasons that follow, the Court **DENIES** Defendant Elbert Lee Hale's and Defendant Joyce A. Hale's motions to suppress evidence. (Docs. 21, 22.)

## I.      FACTUAL BACKGROUND

Defendant Elbert Hale is the owner and operator of Cheeks Gentleman's Club ("Cheeks"), located at 906 Watertower Lane, West Carrollton, Ohio. In June 2004, the Ohio Organized Crime Investigations Commission (OOCIC) opened a criminal investigation into Hale's operation of that business. In October 2004, OOCIC agents approached Special Agent Della Blunk of the Internal Revenue Service (IRS) Criminal Investigation Division with information about Defendant Elbert Hale. Agent Blunk reviewed the information and decided to open a grand jury investigation in April 2005. Both the IRS and the OOCIC were involved in the investigation.

On May 11, 2006, Agent Blunk presented five search warrant applications to Magistrate Judge Merz. (See Gov't Exs. 1-5.) The applications were supported by a common affidavit (hereinafter "Warrant Affidavit A")[1] sworn to by Agent Blunk. (Gov't Exs. 1-5.) Warrant Affidavit A, which numbers twenty-two pages and is therefore too lengthy to reproduce in full herein, alleges that during the years 2000 through 2004, Elbert Hale and other named and

_____

[1] Warrant Affidavit A appears as "Attachment C" to Government Exhibits 1-5.

unnamed coconspirators conspired to commit an offense or to defraud the Government and attempted to evade or defeat federal income taxes by "skimm[ing] large sums of cash business receipts" from Cheeks (see Warrant Affidavit A at 21), and provides a detailed description of the basis for the requested search warrants.  The affidavit begins with a description of Agent Blunk's background and experience, provides a brief summary of the investigation into Elbert Hale's operation of Cheeks, and describes Agent Blunk's beliefs, based upon her experience, as to the type behavior and evidence commonly involved in the type of tax evasion scheme alleged therein.

The affidavit also includes a detailed description of information that Agent Blunk and OOCIC agents obtained during the investigation.  In that description, Agent Blunk indicates that information was obtained through two confidential informants.  The first informant ("CI-1"), described as "a source of proven and established credibility," claimed to have been a personal and business associate of Elbert Hale's for a number of years and participated in several recorded conversations with Hale.  (Warrant Affidavit A at 5.)  Sometime prior to June 24, 2004, CI-1 contacted Ohio law enforcement officers regarding the business activities of Elbert Hale and was referred to OOCIC agents. CI-1 advised those agents that he believes Elbert Hale reports only half of his business income.  He further advised that in 2003, Elbert Hale entered into an agreement with William Rex Gibson, of Gibson Group Investments, to sell a portion of Cheeks and that the final agreement resulted in both men having a fifty percent ownership interest.  (Warrant Affidavit A at 6.)  According to CI-1, Gibson gave Elbert Hale a $1,000,000 check drawn on a Fifth Third bank account and CI-1 believed that the transaction was structured

to appear as though the check was a loan rather than payment for an ownership interest in Cheeks.  (Id.)

CI-1 also provided information about the Hales' accounting practices, including a description of how the cash receipts are handled on a daily basis and where cash and accounting records are stored.  For example, CI-1 advised that Cheeks requires payment by cash and that the cash intake for each week is counted and totaled every Friday and any portion of that cash needed to pay business expenses is placed into a U.S. Bank account.  The remainder of the cash is split evenly between Elbert Hale and Gibson.  (Id.)  According to CI-1, sources of income for the business include but are not limited to fees for credit card cash advances processed in the club, an ATM machine located in the club, vending machine proceeds, customer cover charges, bar sales, and fees collected from dancers.  (Warrant Affidavit A at 7-8.)

On several mornings in January, February, and November of 2005, CI-1 was equipped with an audio recording device prior to entering Cheeks.  On those occasions, which are described in the affidavit, CI-1 overheard conversations between Elbert Hale, Joyce Hale, and Gibson regarding the club's income and was provided with information from which he was able to determine the gross income for the club for various weeks.  (Warrant Affidavit A at 8-9.)  CI-1 also learned that during two weeks in January and February of 2005, Hale and Gibson each received approximately $10,000 to $12,000 in cash out of the gross income.  (Id.)  In November of that year, CI-1 learned from Joyce Hale that the figures had remained relatively consistent.  (Warrant Affidavit A at 9.)

The second confidential informant ("CI-2") is an individual who owned and operated several nightclubs similar to Cheeks and who therefore had extensive knowledge about the adult

entertainment industry.  (Warrant Affidavit A at 10.)  CI-2 was described as a "source of proven and established reliability" who has provided extensive information on other investigations by the IRS and other law enforcement agencies.  (Id.)  Through surveillance of Cheeks, CI-2 gathered information about the club's income from employees of the club, including a dancer who claimed to be "close" to Gibson.  CI-2 also spoke directly to Gibson about the club's performance.  (Id.)  Based on these conversations and his knowledge of the adult entertainment industry, CI-2 estimated Cheeks' gross weekly income was at least $50,000.  (Id.)

Agent Blunk and OOCIC agents were able to independently corroborate a portion of the information provided by the confidential informants.  (Warrant Affidavit A at 11-15.)  The corroborating evidence is described in detail in Warrant Affidavit A.  A sample of the corroborating evidence includes the following:  The agents verified information that the informants provided about Gibson's background and business dealings.  (Warrant Affidavit A at 11-12.)  The agents also investigated two bank accounts, one in the name of Elbert Hale and the other in the name of Cheeks, and found evidence of financial transactions consistent with information provided by CI-1.  (Warrant Affidavit A at 11-13.)  Through independent surveillance conducted by undercover agents within the club, the agents were able to verify information regarding fees that the dancers are required to pay.  (Warrant Affidavit A at 14.) The agents also reviewed the recordings from the confidential informants' surveillance activities and found that those recordings corroborated information regarding the weekly gross income of the club, the cash split between Hale and Gibson, and Gibson's ownership interest in the club. (Warrant Affidavit A at 14-15; Warrant Affidavit B at 14-15.)

Agent Blunk also described in Warrant Affidavit A evidence in addition to the corroborating information that she and the OOCIC agents had uncovered through investigation. For example, the agents conducted surveillance of Cheeks, during which they observed the routine behaviors of Elbert Hale, Joyce Hale, Gibson, and others. (Warrant Affidavit A at 12, 15.) They observed Joyce Hale carrying a large handbag when entering and exiting the club each day and found that on Friday mornings, Gibson carried a briefcase, retrieved from the trunk of his car, in and out of the club. (Warrant Affidavit A at 15.) During the mornings of February 25, 2005 and May 11, 2005, the agents observed Joyce Hale carry a black notebook out of the club and place the notebook in the trunk of her car. (Warrant Affidavit A at 15-16.) Further surveillance on both occasions revealed that Joyce Hale left the notebook in the trunk of her car when she arrived at home. (Id.) Finally, in addition to surveillance operations, the agents examined the individual income tax returns of Elbert Hale for the years 2000 through 2003 and the corporate tax returns of Cheeks for the years 2001 through 2004. (Warrant Affidavit A at 17-18.)

At the suppression hearing, Defendants challenged Agent Blunk's reliance on the confidential informants, arguing that the informants were biased and were not credible. Agent Blunk testified that she believed the informants to be credible because agents were able to corroborate information received from the informants. Agent Blunk also testified that OOCIC agents had administered a polygraph examination to CI-1. Though Agent Blunk was not present for the polygraph, she claimed she had no reason to believe CI-1 had not passed. According to Agent Blunk, CI-1 contacted law enforcement officers about Hale of his own volition. She stated that she did not believe that CI-1 had been charged with a crime or that CI-1 was being

investigated for any criminal acts, but she did no independent investigation into CI-1's criminal history. Agent Blunk clarified that CI-1 worked specifically with an OOCIC agent and therefore was under the responsibility of OOCIC. She trusted the information she received from those agents as to the informant's reliability. With the exception of one meeting, Agent Blunk had no personal contact with CI-1. Rather, CI-1 worked mainly with OOCIC agents and those agents informed Agent Blunk of the information CI-1 provided.

As to CI-2, Agent Blunk testified that the informant had been charged criminally and provided assistance in order to better his position at sentencing. CI-2 had previously provided assistance to another IRS agent in a similar capacity. CI-2 participated in audio-recorded surveillance at Cheeks and made contact with Gibson but had no personal contact with the Hales.

After reviewing the warrant applications, Magistrate Judge Merz issued the requested warrants. The warrants covered the following locations and vehicles: (a) a white 1998 Oldmobile Aurora, known to be operated by William Rex Gibson; (b) a maroon 1999 Chevrolet Lumina, registered to Joyce Hale; (c) a green 2002 Chevrolet Avalanche Truck, registered to Elbert Hale; (d) 1701 Ladera Trail, Dayton, Ohio 45459, the known residence of Elbert Hale; and (e) Cheeks Gentleman's Club, 906 Watertower Lane, West Carrollton, Ohio 45449. (See Gov't Exs. 1-5, Warrant Applications and Attachment A to Warrant Applications.)[2] Each of the five warrants has two attachments. Attachment A provides a detailed description of the "Persons, Locations, and Items to be Searched." Attachment B is a four page single-spaced

---

[2] The warrant applications and warrants were electronically filed in the following cases: 1998 Oldsmobile Aurora, Case No. 3:06-mj-113; 1999 Chevrolet Lumina, Case No. 3:06-mj-114; 2002 Chevrolet Avalanche Truck, Case No. 3:06-mj-115; 1701 Ladera Trail, Dayton, Ohio 45459, Case No. 3:06-mj-116; Cheeks Gentleman's Club, 906 Watertower Lane, West Carrollton, Ohio 45449, Case No. 3:06-mj-117.

typed description of the "Property to be Seized," listing a number of items summarized in the first sentence of the description as:

> [D]ocuments, information, records, and/or other data covering the period beginning December 1, 1999 through the date of the affidavit, related to the ownership of assets, liabilities, income, and expenses of ELBERT LEE HALE and related business entities in behalf of or under the control of ELBERT LEE HALE . . .

(See Gov't Exs. 1-5, Attachment B.)

On the morning of May 12, 2006, after obtaining the warrants, Agents Blunk and Vant proceeded to Cheeks to execute the search warrants.[3] More than ten officers were present for the search, including City of Dayton Police Detective William Myers and several West Carrollton police officers. Only two officers were in full uniform. The other officers wore plain clothes and police vests. All of the officers had firearms, but no one on the entry team drew his or her weapon. At approximately, 8:30 a.m., the West Carrollton Chief approached the door of Cheeks. When Elbert Hale opened the door, Agent Blunk, Agent Vant, and other officers gained entry to the club.

Elbert and Joyce Hale, an individual known as Jonathan Edwards, and several Cheeks employees were present at the club on the day of the search. Upon entering the club, the officers separated those individuals as a safety precaution. All of the officers were assigned a specific role prior to the search. Agent Blunk made first contact with Joyce Hale. After identifying herself, Agent Blunk led Joyce Hale to a table where she could sit down. During this time, Agent Blunk observed that Joyce Hale seemed upset and was shaking. Hale subsequently asked

---

[3] Ultimately, the officers executed only four of the five search warrants that morning. There was no need to execute the warrant for the white 1998 Oldmobile Aurora because Gibson consented to the search of his vehicle.

Agent Blunk to retrieve medicine from her purse. Agent Blunk retrieved the medication and another agent brought Joyce Hale something to drink so that she could take the medicine.

Agent Blunk had prepared an outline of questions for Joyce Hale prior to the search, but she did not actually interview Hale. (See Gov't Ex. 7.) Instead, she assigned Agent Laurel Vant to that interview. Accordingly, shortly after making contact with Joyce Hale, Agent Blunk left Hale with Agent Vant and Dayton Police Detective William Myers. Agent Blunk testified that she did not read Joyce Hale her rights or instruct any other agent to read Hale her rights because, at that time, she did not believe Joyce Hale to be a suspect.

Agent Blunk then spoke with Elbert Hale. In contrast to Joyce Hale, Elbert Hale was advised of his rights. Agent Blunk testified that she Mirandized Elbert Hale because he was viewed as a target of the investigation. After being read his rights, Hale requested an attorney and gave agent Blunk a phone number. Elbert Hale made no other statements. Though Hale's movement was restricted in that he could not walk around the club unaccompanied, he was not placed in handcuffs, arrested, or taken into custody.

Meanwhile, Agent Vant and Detective Myers, using the outline provided by Agent Blunk, proceeded to interview Joyce Hale. (See Gov't Ex. 7.) Agent Vant testified that Joyce Hale was interviewed because the agents believed her to be the bookkeeper of Cheeks. Agent Vant also stated that she and Detective Myers viewed Hale as a witness at that time, rather than a suspect, and that they informed Hale that they believed her to be a witness. The interview dealt in part with Joyce Hale's methods of bookkeeping and accounting. Agent Vant also asked questions about the business operation of Cheeks, addressing such topics as the various sources of income for the club and the terms of the business agreement between Elbert Hale and Gibson.

(See id.)  Hale appeared to Agent Vant to be somewhat nervous, but she continued to answer questions.  Detective Myers testified that Hale's demeanor seemed fine during the questioning but that she appeared to be answering questions in a manner to avoid implicating Elbert Hale in any wrongdoing.  At some point near the end of the interview, Joyce Hale asked for her medicine.  Also at some point during the interview, Agent Vant and Detective Myers looked through Joyce Hale's purse.

At least twice during the interview, Agent Vant asked Joyce Hale about the black book she had previously been observed placing in her trunk.  Hale denied knowledge of the book.  Hale also denied knowledge of records or receipts from couch dances and VIP sessions at the club.  At the conclusion of the interview, Detective Myers informed Joyce Hale that they had a warrant to search her vehicle.  Hale willingly turned over her keys.  Detective Myers searched the vehicle and found a black notebook in her car.  The notebook appeared to have been used for accounting and contained two sets of revenue figures for each date.  It also contained receipts from VIP sessions and couch dances.  Based on this discovery, Detective Myers and Agent Vant concluded that Joyce Hale had lied to them about her knowledge of the book and receipts.  Detective Myers showed the book to Hale and accused her of lying to him and Agent Vant.  At that point, Agent Vant Mirandized Hale.  After Hale was read her rights, Detective Myers asked her whose handwriting was in the black book.  Hale replied that it was her writing.  She then went into the bathroom, where she may have vomited and wet herself.  When she returned, she said she did not want to answer any more questions.[4]  However, Detective Myers continued to

---

[4] In a memorandum of interview drafted on May 14, 2006, Agent Vant noted that Joyce Hale identified the writing in the black book as her own after invoking her right to remain silent rather than before.  (See Def. Ex. A.)  However, the written notes that Agent Vant took during the course

ask a few more questions. Specifically, Detective Myers asked her whose handwriting was on a yellow slip of paper in the book and why there were two sets of numbers for each date.

In total, Agent Vant and Detective Myers questioned Joyce Hale for a little over an hour. Agent Vant testified that Hale was not in custody during the time of the interview. She was not handcuffed or arrested. According to Agent Vant, Hale was free to leave at any time. After concluding all questioning, Agent Vant and Detective Myers sought Hale's permission to search her residence, but she refused. As a result, Agent Blunk applied for a sixth warrant on May 12, 2006 for the search of Joyce Hale's residence, 1232 Kemper Avenue, Dayton, Ohio. (See Gov't Ex. 6.) The affidavit submitted in support of the warrant (hereinafter "Warrant Affidavit B")[5] differs only slightly from Warrant Affidavit A in that it provides a description of the events that took place during the interview of Joyce Hale and the search of her car. (Gov't Ex. 6.)[6] That same day, Magistrate Judge Merz issued a warrant[7] to search Joyce Hale's residence and the search was executed. Officers also executed the search warrant for Elbert Hale's residence on

_____

of the interview indicate that Hale identified her handwriting prior to invoking her right to remain silent. (See Gov't Ex. 7.) During the suppression hearing, Agent Vant indicated that her notes were correct and that her memorandum of interview was incorrect. She claimed she realized the error while reviewing the memorandum prior to testifying and indicated that the notes she took the day of the interview are accurate and consistent with her memory. The Court finds her testimony credible and finds that the notes taken contemporaneously with the interview are more reliable than the memorandum of interview, drafted two days after the interview.

[5] Warrant Affidavit B appears as "Attachment C" to Government Exhibit 6.

[6] The warrant application and warrant for Joyce Hale's residence were electronically filed in Case No. 3:06-mj-122.

[7] Just as with the other five warrants, the warrant to search Joyce Hale's house is supplemented by two attachments. Attachment A, differing from Attachment A to the other warrants, describes only one residence to be searched, 1232 Kemper Avenue in Dayton, Ohio. Attachment B is similar to Attachment B to the previous warrants. (See Gov't Ex. 6.)

May 12, 2006.  Over the course of the day, several items were seized, including ledgers, financial documents, and other records.  Defendants now move to suppress that evidence as well as any statements made by Joyce and Elbert Hale.

## II.    ANALYSIS

### A.    Items Seized Pursuant to the Search Warrants

Defendants attack the constitutionality of the May 12, 2006 searches on two grounds.  First, they claim that the search warrants are overly broad, lack specificity, and were not properly executed.  Second, they argue that the affidavits submitted in support of the warrants were insufficient to support a finding of probable cause.

### 1.    Scope and Particularity of the Warrants

The Fourth Amendment states that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation, <u>and particularly describing the place to be searched, and the persons or things to be seized</u>."  U.S. CONST. amend. IV (emphasis added).  "The purpose of this particularity requirement is to prevent the use of general warrants authorizing wide-ranging rummaging searches in violation of the Constitution's proscription against unreasonable searches and seizures."  <u>United States v. Logan</u>, 250 F.3d 350, 364-65 (6th Cir. 2001).  The particularity required in any given warrant depends on the circumstances of each particular case.  <u>Id.</u> at 365; <u>see also</u> <u>United States v. Blair</u>, 214 F.3d 690, 696 (6th Cir. 2000) ("[T]he degree of specificity in a warrant must be flexible, depending upon the type of items to be seized and the crime involved."); <u>United States v. Henson</u>, 848 F.2d 1374, 1383 (6th Cir. 1988) (finding that "the degree of specificity required is flexible and will vary depending on the crime involved and the

types of items sought").  A description contained in a warrant is sufficiently particular if it is as specific as the circumstances and the nature of the alleged crime permit.  <u>Logan</u>, 250 F.3d at 365.

As described above, attached to each warrant in the instant case was a specific description of the persons, locations, and items to be searched as well as the items to be seized. The attachments are specifically referenced and incorporated on the face of the warrants.  <u>See</u> <u>Groh v. Ramirez</u>, 540 U.S. 557-58 (2004) (noting that "most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant").  Attachment A to each warrant provides a detailed description of the persons, locations, and items to be searched.  Attachment B to each warrant provides an equally detailed description of the items to be seized.

The Government recognizes that the description of the items to be seized is broad in scope, but argues that "the exhaustive list of items . . . is justified due to the vast business enterprises of" the Defendant.  Indeed, the warrants do not appear to be overbroad given the nature of the case.  The documents, records, and other data to be seized, though diverse, are limited to a certain time frame and subject matter, specifically the assets, liabilities, income, and expenses of Elbert Hale and of the business entities under Elbert Hale's control.  The fact that the warrant uses generic terms to describe many of the items (e.g., "investment statements and reports," "articles of incorporation") is not fatal.  <u>See</u> <u>Henson</u>, 848 F.2d at 1383 ("'Where the precise identity of goods cannot be ascertained at the time the warrant is issued, naming only the generic class of items will suffice.'" (quoting <u>United States v. Porter</u>, 831 F.2d 760, 764 (8th Cir. 1987)); <u>United States v. Harmon</u>, No. 3:05-CR-113, 2006 WL 3913439, at *12 (E.D. Tenn. Apr.

4, 2006). The agents in this case could not have known the precise documents and records Defendants utilized in the alleged tax evasion scheme. See United States v. Abboud, 438 F.3d 554, 575 (6th Cir. 2006). Accordingly, the Court finds that the scope of the warrants is not unreasonable and that the warrants satisfy the Fourth Amendment's particularity requirement.

As far as the execution of the searches, Defendants do not point to any specific wrongdoing on the part of the officers or agents. Indeed, the Court finds no evidence that any of the agents or officers involved in the searches exceeded the scope of the warrants or acted unreasonably in executing the warrants.

**2.      Sufficiency of the Warrant Affidavits**

Defendants argues that the affidavits submitted in support of the warrants are insufficient to establish probable cause because the contents of the affidavits are conclusory in nature and are deliberately or recklessly false. Defendants further challenge Agent Blunk's reliance on the confidential informants, arguing that the informants are not reliable and that they provided false information.

The Supreme Court has defined "probable cause" as the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). Probable cause has at other times been described as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). A finding of probable cause "requires only a probability or substantial chance of

criminal activity, not an actual showing of such activity." <u>Illinois v. Gates</u>, 462 U.S. 213, 244 n. 13 (1983).

Courts must review the determinations of probable cause made by warrant-issuing judges with "great deference." <u>United States v. Leon</u>, 468 U.S. 897, 914 (1984); <u>see also</u> <u>United States v. Leake</u>, 998 F.2d 1359, 1362-63 (6th Cir. 1993) (In reviewing a state magistrate's determination of probable cause, this court pays great deference to a magistrate's findings, which should not be set aside unless arbitrarily exercised." (internal quotations omitted)). "A warrant must be upheld as long as the magistrate had a 'substantial basis for ... conclud[ing] that a search would uncover evidence of wrongdoing.'" <u>United States v. Smith</u>, 182 F.3d 473, 477 (6th Cir. 1999) (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 236 (1983)). In reviewing a magistrate's determination of probable cause, this Court applies a totality of the circumstances test "'to make a practical, commonsense,' not hyper-technical, determination of whether probable cause is present." <u>United States v. Martin</u>, 526 F.3d 926, 936 (6th Cir. 2008) (quoting <u>Gates</u>, 462 U.S. at 238). An affidavit submitted in support of a warrant request "must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant." <u>Smith</u>, 182 F.3d at 477 (citing <u>Whiteley v. Warden</u>, 401 U.S. 560, 564 (1971)). "The supporting facts in an affidavit need not be based on direct knowledge and observations of the affiant, but may come from hearsay information supplied by an informant." <u>Id.</u> "Under the totality of the circumstances approach, [the Court's] task is to assess the adequacy of all the circumstances set forth in the affidavit, including the veracity and basis of knowledge of a confidential informant[s], as well as law enforcement's corroboration of the informant[s'] tip[s]." <u>Martin</u>, 526 F.3d at 936.

With regard to the sufficiency of the affidavits in the instant case, the Court may dispose quickly of Defendants' first two arguments. First, rather than containing conclusory statements, the affidavits are highly factual in nature and describe specific actions on the part of the Defendants and their associates. Second, there is no evidence that the affidavits contain false information or that any of the information provided by the confidential informants was false.

This leaves the Court with Defendants' challenge to Agent Blunk's reliance on the confidential informants. Considering first the informants' basis of knowledge, the Court finds that the affidavits indicate the manner in which the informants gathered information – mainly through firsthand observation. The affidavits also contain information regarding the informants' relationship to the Defendants and describe particular aspects of the informants' backgrounds – for example, that CI-1 was a personal and business associate of Elbert Hale's for a number of years and that CI-2 was an individual with extensive knowledge of the adult entertainment industry – that contribute to their basis of knowledge.

With regard to the veracity of the confidential informants, Agent Blunk sufficiently described in the affidavits the basis upon which she determined the informants to be credible and the information provided by them to be reliable. See Smith, 182 F.3d at 478. Because there is no indication that CI-1 has previously acted as a confidential informant in other matters, CI-1's veracity cannot be shown through past performance. However, "[t]he reliability of hearsay statements of a confidential informant 'may be corroborated by various means, including direct surveillance or circumstantial evidence.'" Id. (quoting United States v. Jordan, 999 F.2d 11, 14 (1st Cir. 1993)). In this case, CI-1's reliability was borne out through the agents' independent

investigation.  As described below, the agents were able to corroborate much of the information provided by CI-1.

CI-2's statements were similarly corroborated.  Additionally, in contrast to CI-1, CI-2 had worked with law enforcement agents in the past as an informant.  The Court recognizes that Agent Blunk failed to disclose that CI-2 cooperated with the agents in this case at least in part because of criminal charges he faced in another matter.  However there is no evidence that this omission was made intentionally or with reckless disregard for the truth. In light of the abundance of evidence corroborating CI-2's statements, the Court does not find this omission to be critical.

Indeed, the affidavits describe a significant amount of corroborating evidence. CI-1 provided specific information about the bookkeeping and accounting practices of Elbert Hale with regard to his operation of Cheeks.  CI-1 also provided a detailed account of the type and amount of income that Cheeks brings in on a weekly basis, the general amount of money spent on weekly operating costs, and the amount of money that Hale retained as personal income. Additionally, CI-1 provided information regarding Gibson's relationship with Elbert Hale and Gibson's suspected part ownership of Cheeks.  Agents corroborated much of this information through their independent surveillance, their review of audio recordings obtained by CI-1 under the agents' direction and supervision, and their independent investigation of bank records for accounts belonging to Elbert Hale and Cheeks.  The information provided by CI-2 regarding the sources of income for the club and Gibson's ownership interest in Cheeks is consistent with the information provided by CI-1 and was similarly corroborated through audio recordings of CI-2's surveillance sessions, and the agents' independent surveillance.

Defendant argue that Agent Blunk did not adequately investigate the information provided by the confidential informants and claims that if she had, she would have determined this information to be false. To the contrary, the significant amount of corroborating evidence in the affidavits demonstrates that Agent Blunk and the other agents conducted a sufficient investigation of the confidential informants' statements. It is not necessary that the agents corroborate every piece of information. See Smith, 182 F.3d at 481 (noting that "each factual allegation put forth in an affidavit need not be independently documented"). "Instead, probable cause simply requires that enough information be presented for a magistrate to make a judgment that the charges are not capricious and are sufficiently supported to justify bringing into play further steps of the criminal process." Id. (internal quotations omitted).

In considering the totality of the circumstances, the Court finds that the information described in the affidavits, including the information received from the confidential informants, the agents' independent surveillance and investigation, and the agents' review of past income tax returns for Cheeks and for Elbert Hale, was sufficient to establish probable cause that Elbert Hale and others were engaged in a profit skimming and tax evasion scheme and that evidence of that scheme would be found at the locations and within the vehicles for which search warrants were granted.

Finally, even were this Court to conclude that the warrant was deficient in probable cause, the Court finds that the agents and officers executing the searches relied in good faith on

what appeared to be facially valid warrants.[8] Exclusion of the evidence seized during the searches is therefore not warranted.

## B. Defendants' Statements

Both Defendants move to suppress all statements they made, alleging violations of their <u>Miranda</u> rights. Defendants also allege that the agents' actions were coercive, rendering any of Defendants' statements involuntary. The Court notes first that Elbert Hale's motion with regard to his <u>Miranda</u> rights is moot as there is no evidence that he made any statements. Joyce Hale, on the other hand, made several statements to Agent Vant and Officer Myers.

### 1. Miranda Rights

The Supreme Court, in <u>Miranda v. Arizona</u>, 384 U.S. 436, 478-79 (1966), held that suspects must be advised of their rights prior to being subjected to a custodial interrogation. "In order to encourage compliance with this rule, incriminating statements elicited from suspects in custody cannot be admitted at trial unless the suspect was first advised of his or her <u>Miranda</u>

---

[8] The Supreme Court in <u>United States v. Leon</u>, 468 U.S. 897, 905 (1984), held that the exclusionary rule "should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." In other words, even if a warrant is defective, the defect would not result in the automatic exclusion of evidence found during the search. There are four specific situations where the good faith reliance exception would not apply and evidence may be excluded: (1) where the "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) where the "issuing magistrate wholly abandoned his judicial role" and failed to act in a neutral and detached manner; (3) where the warrant is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) where the warrant is "so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid." <u>Id.</u> at 923 (internal quotations omitted); <u>see</u> <u>also</u> <u>United States v. Van Shutters</u>, 163 F.3d 331, 337 (6th Cir. 1998). None of these situations occurred in the instant case.

rights." United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998) (citing Stansbury v. California, 511 U.S. 318, 322 (1994)). Because the Miranda rule applies only to suspects who are in custody at the time of interrogation, the Court must first determine whether Joyce Hale was "in custody" at any time during her interview. See United States v. Warner, 971 F.2d 1189, 1201 (1992) (noting that the Sixth Circuit has "repeatedly held that a person is not entitled to be notified of her Miranda rights before an interrogation if that person is not 'in custody.'"); see also United States v. Davis, 27 F. App'x 592, 601 (6th Cir. Dec. 27, 2001).

For an individual to be "in custody," there must be "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." Thompson v. Keohane, 516 U.S. 99, 112 (1995). In determining whether an individual is "in custody" for purposes of applying the Miranda doctrine the Court looks to the totality of the circumstances "to determine 'how a reasonable man in the suspects's [sic] position would have understood the situation.'" Salvo, 133 F.3d at 948 (quoting United States v. Phillip, 948 F.2d 241, 247 (6th Cir. 1991)). The Court considers such factors as:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

Id. at 950. The Court also considers "whether a reasonable person in the suspect's situation would have believed that she was free to terminate the interrogation and leave." United States v. Crossley, 224 F.3d 847, 861 (6th Cir. 2000).

Weighing these factors in the instant case, the Court finds that the circumstances surrounding the majority of Joyce Hale's interview, the portion taking place prior to the search of her car, would not lead a reasonable person to believe that she was under formal arrest or restrained in her freedom of movement to the degree associated with formal arrest. See United States v. Mahan, 190 F.3d 416, 421 (6th Cir. 1999). First, neither Agent Blunk, Agent Vant, or Detective Myers viewed Joyce Hale as a suspect. Instead, Hale was considered a witness or "person of interest" who likely had information about the bookkeeping practices for Cheeks. Second, Hale was interviewed in a neutral place. Specifically, she was interviewed near the bar in an open area of the club and was not placed in a small interrogation room. Third, the length of questioning, just over an hour, was not unreasonable. Fourth, the nature of the interview was not coercive, as discussed below.

As to the other factors, the Court notes that though Joyce Hale was never explicitly told that she could leave at any time, neither was she told that she was not free to leave. Her freedom of movement was not significantly restrained. She was free to move about the club as long as she was accompanied by an agent of officer, and Agent Vant testified that Hale was free to leave at any time. The agents allowed Hale to take her medication and provided her with something to drink. Finally, none of the agents or officers made any show of force toward Joyce Hale or brandished a firearm or handcuffs. A reasonable person, under these circumstances would have believed that she was free to terminate the interview and leave.[9] See Mahan, 190 F.3d at 421-22

---

[9] The few factors that would indicate that Hale was in custody – namely, the number of officers present at Cheeks during her interview and the fact that Joyce Hale did not initiate contact with the police or IRS, but rather was asked questions during the search – do not outweigh the numerous factors discussed above.

(finding that the defendant was not in custody where officers interrogated him in an interview room in his place of employment for an hour and a half and told him that giving false information would be a serious matter, but did not make any show of force, did not brandish their weapons or handcuffs, did not tell the defendant he was not free to leave, and did not communicate any threat of arrest); United States v. Vidal, 85 F. App'x 858, 859-63 (3d. Cir. Jan. 27, 2004) (finding the defendant was not in custody when three officers interrogated him in his home for approximately an hour and fifteen minutes and where the defendant was never placed under arrest and was permitted to move about his house accompanied by an agent, go to the bathroom, and take his diabetes medication). The agents were not required to read Hale her rights prior to interviewing her.

The circumstances changed somewhat after Detective Myers confronted Hale with the black notebook found in the trunk of her car and Agent Vant read Hale her rights, particularly in that the nature of the questioning appears to have turned more forceful and Detective Myers accused Hale of lying. Nonetheless, the Court does not find these new circumstances to convert the encounter into a custodial interrogation. Just as before, Hale was not handcuffed or informed that she was under arrest. Neither Agent Vant nor Detective Myers specifically restrict her movement. She was permitted to use the restroom. Indeed, Officer Vant testified that she only read Hale her rights out of an abundance of caution for her rights. Because Hale was not in custody at anytime during her interview, Miranda does not require the suppression of her statements.

## 2. Alleged Coercion

Hale next argues that her statements should be suppressed as involuntary. "In determining whether a defendant's statements have been elicited by means that are unconstitutional, this court looks to the totality of the circumstances concerning whether a defendant's will was overborne in a particular case." Ledbetter v. Edwards, 35 F.3d 1062, 1067 (6th Cir. 1994) (quotation omitted). The Government bears the burden of demonstrating that Hale's statements were voluntary. Mahan, 190 F.3d 416, 422 (6th Cir. 1999). "To support a determination that a [statement] was coerced, the evidence must establish that: (1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear defendant's will; and (3) defendant's will was, in fact, overborne as a result of the coercive police activity." United States v. Rigsby, 943 F.2d 631, 635 (6th Cir. 1991). Relevant factors that the Court may consider include "the defendant's age, education and intelligence; whether the defendant has been informed of [her] constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." Mahan, 190 F.3d at 423.

The totality of the circumstances in this case indicate that Joyce Hale's statements, at least up to the point when she invoked her right to remain silent, were the product of free and rational choice. With regard to the statements made prior to Hale having been read her rights, factors indicating a lack of coercion include the following: Hale was never handcuffed or placed under or threatened with arrest. None of the agents or officers brandished their weapons or otherwise threatened Hale with force. Hale's movement was not significantly restricted and she was permitted to take her medication upon request. Finally, the interview lasted just over an

hour and was conducted in an open area of Cheeks club, a setting that was familiar to Hale. Mahan, 190 F.3d at 423 (finding no coercion under similar circumstances).

The Court also finds that the statements Hale made after being read her rights were also voluntary. Hale showed additional signs of nervousness after being shown the black book. Indeed, Agent Vant testified that there were marked changes in Hale's demeanor after Detective Myers returned from Hale's car with the black notebook. Additionally, Hale became sick in the bathroom and wet herself. While Hale's increased nervousness and physical illness may demonstrate that Hale was in a more susceptible state at that time, neither Agent Vant nor Detective Myers operated in an objectively coercive manner. See Abela v. Martin, 380 F.3d 915, 928-29 (6th Cir. 2004) (holding that although the defendant was in the hospital for a broken nose, had consumed large quantities of alcohol the night before, and was on pain medication at the time officers questioned him, his statements were not involuntary where there was no evidence that the defendant's mental capacity was impaired by the alcohol and medication and there was no evidence of police coercion). Indeed, they continued to allow Hale to move about freely, including allowing her to use the restroom, did not deprive her of any basic needs, and continued to question her for only a short period. Finally, to the extent that Hale had become ill in the bathroom, there is no indication that the illness negatively impacted her mental capacity. The Court therefore finds that Defendant Joyce Hale's statements were not the result of police coercion.

### III.   CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant Elbert Lee Hale's Motion to

Suppress (doc. 21) and Defendant Joyce A. Hale's Motion to Suppress (doc. 22).

IT IS SO ORDERED.


___s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court